FILED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT
MAR 18 2008
CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

**STEVEN TROY VALDEZ,**
**Plaintiff,**
**vs.**
**PHILIP NEUMAN, an individual; and HILO AT CAMPBELL HALL ASSOCIATES, LLC, a New York limited liability company,**
**Defendants.**

**Case No.: SACV 06-00448-CJC(MLGx)**

**MEMORANDUM OF DECISION**

## I. INTRODUCTION

The Court conducted a four day bench trial on December 26 – 28, 2007 and January 4, 2008. After considering all of the evidence, testimony, and arguments of counsel, the Court finds in favor of Defendants Philip Neuman and HILO at Campbell Hall Associates, LLC (collectively "Defendants"). Plaintiff Steven Troy Valdez has not proven that Defendants materially breached the Mesa Top Operating Agreement or committed fraud in connection with that agreement to support his claims against Defendants. More specifically, Mr. Valdez did not prove that Defendants promised or

agreed to pay him a $15,000 monthly salary or that HILO breached its obligation or promise under the Mesa Top Operating Agreement to assume the $265,000 debt incurred by Mr. Valdez. If Mr. Valdez wanted Mr. Neuman to pay to him a monthly salary and pay all of his outstanding debt on demand, Mr. Valdez should have put those terms in the Mesa Top Operating Agreement. This Court cannot insert terms in the parties' agreement that Mr. Valdez now wishes were there.[1]

## II. FINDINGS OF FACT

Plaintiff Steven Troy Valdez is a resident of Corona del Mar, California and conducts his business ventures through a corporate entity known as B2 Brands, Inc. In or around 2003, Mr. Valdez began developing a unique line of malt-based alcoholic beverages commonly referred to in the industry as "malternative beverages." Mr. Valdez created three different lines of flavored malt beverages: Hard Creamers (cream-based malt beverages in strawberry daiquiri, creamsicle and cactus pear margarita flavors), Kalima Hawaiian Hard Creamers (primarily tropical-fruit flavored beverages such as pineapple-banana and orange-peach) and Sangria.

Beginning in late 2004, Mr. Valdez incurred a number of debts totaling slightly under $265,000. Mr. Valdez took out two loans from Mike Kerr, a Newport Beach, California-based businessperson, in December 2004 and January 2005 equaling $155,466.67 with interest. (Ex. 62.) The Kerr loans were secured by all of Mr. Valdez's stock in B2 Brands and were due on December 20, 2005. (Ex. 27.) Mr.

[1] The Court agrees with Defendants that it is very significant that the Mesa Top Operating Agreement contains no provision requiring Defendants to pay Mr. Valdez a $15,000 monthly salary or pay on demand any of the $265,000 debt incurred by Mr. Valdez. The Court, however, disagrees with Defendants that the Mesa Top Operating Agreement is a fully integrated written agreement and that extrinsic evidence cannot be considered. Accordingly, the Court's ruling in favor of Defendants is based on the wording of the Mesa Top Operating Agreement and the extrinsic evidence presented by the parties.

Valdez also took out a number of small loans from Jim Holloway between May and October of 2004 totaling $42,225.21 with interest. (Ex. 63.) The Holloway Loan was not in exchange for any security interest in B2 Brands. Mr. Valdez also purchased $52,967 in point-of-sale materials such as table tents, counter cards, case cards, static clings and other materials necessary to market and brand the beverages from a company called Unisource. (Ex. 63; 12/27/07 Tr. Trans., 134:20-135:2.) Mr. Valdez also incurred $1,822 in distribution-related costs to Southern Wine & Spirits and $2,683 in production-related expenses to Lion Brewery in Wilkes-Barre, Pennsylvania. (Ex. 62.) Finally, Mr. Valdez had accumulated $9,063 in legal expenses from McDermott Will & Emery during the development and registration of his products.[2] (Ex. 163.)

Mr. Valdez unveiled his products at the National Beer Wholesalers Association trade show in 2003. In addition to introducing his product to the beverage community, Mr. Valdez also sought to line up investors to finance and support a wider launch of his products. Particularly, Mr. Valdez was shopping a twenty percent interest in B2 Brands in exchange for a $3 million capital contribution. In April 2005, Ralph Leone, a liquor and wine broker in Las Vegas, introduced Mr. Valdez to defendant Philip Neuman, a resident of Miami, Florida and New York, New York, living and working part-time in Las Vegas. Between April and June 2005, Mr. Valdez and Mr. Neuman had several conversations about entering into a business relationship to produce and distribute Mr. Valdez's line of malternative beverages.

[2] Together, these debts equal $264,335. Mr. Valdez lists $665 as "excess availability," bringing the total outstanding debt to $265,000.

The negotiations culminated in the creation of Mesa Top, LLC, a limited liability company organized under the laws of Nevada.[3] On June 18, 2005, the parties executed the Mesa Top Operating Agreement (the "Agreement"). (Ex. 4.) Under the terms of the Agreement, Mr. Valdez and HILO at Campbell Hall Associates, a limited liability company whose sole and managing member is Mr. Neuman, each owned fifty percent interests in Mesa Top. "HILO by Philip Neuman" was designated as the managing member of Mesa Top. The Agreement specifically defined the roles of both Mr. Valdez and Mr. Neuman:

> **15. Duties and Responsibilities of Members**
>
> VALDEZ shall be responsible for developing distributorship relationships, sales, hiring sales personnel, provided that the employment terms are approved by unanimous consent of members, [sic] train sales personnel.
>
> HILO by Philip Neuman, Managing Member, shall be responsible for funding the purchase of inventory and funding the operating expenses of the company not to exceed the sum of Thirty Five Thousand Dollars ($35,000) per month, and shall be responsible for handling the day to day operations of the Limited Liability Company [Mesa Top].

(Ex. 4.) The Agreement further required Mr. Valdez to assign all of his interests in the beverages to Mesa Top immediately upon its execution.

With respect to Mr. Valdez's pre-existing debts, the Agreement provided:

> **8. Assumption of Debt by the Limited Liability Company**

---

[3] When considered in its entirety, the extrinsic evidence offered by the parties does not establish that Mr. Neuman promised to pay Mr. Valdez a $15,000 monthly salary or pay his $265,000 debt on demand. Instead, the extrinsic evidence more strongly supports Mr. Neuman's position that the parties did not agree to a monthly salary for Mr. Valdez or that all of Mr. Valdez's debt would be paid on demand.

> The Limited Liability Company shall assume debt incurred by VALDEZ in the sum of $265,000 as more specifically set forth in the annexed Exhibit B, upon verification of the debt by the Managing Member.

At the time the Mesa Top Operating Agreement was executed, however, Exhibit B was not annexed or attached. In fact, it did not yet exist. The parties intended that Mr. Valdez would draft Exhibit B as a record of his pre-existing debts. On June 19, 2005, Mr. Valdez sent Mr. Neuman an email entitled "Source & Use Backup" regarding the $265,000 in incurred debts. (Ex. 62.) Also attached to the email were invoices, receipts and documentation for several of the debts, including documentation from Unisource, Southern Wine & Spirits and Lion Brewery. (Ex. 62.)

Between June and November 2005, Mesa Top made monthly payments of $15,000 to Mr. Valdez.[4] (Ex. 14.) Mesa Top's financial ledger lists some of those payments as "salary." (Ex. 21.)

After providing certain documentation on his $265,000 debt, Mr. Valdez began requesting that Mr. Neuman make prompt payments to his creditors. Throughout July and August of 2005, Mr. Valdez was in regular contact with two of Mr. Neuman's associates, Georgia Merkel and Patricia Fischer, requesting payment and providing invoices, receipts and ATM deposit records. Ms. Merkel and Ms. Fischer did not believe the documentation provided by Mr. Valdez was sufficient to establish that the debt was incurred to develop and market the beverages, so they continued to ask for further documentation. With respect to three of the smaller debts, Southern Wine & Spirits, Lion Brewery and McDermott Will & Emery totaling $13,567.74, Mr. Valdez decided not to wait any longer and paid them off himself, presumably using the

---

[4] The initial $15,000 payment, made shortly after the parties executed the Agreement, was drawn from Neuman Associates LLC. The remaining payments were issued by Mesa Top. (Ex. 14.)

monthly payments that he had received from Mr. Neuman. (Ex. 64.) After making those payments directly, Mr. Valdez sought reimbursement from Ms. Merkel. (*See, e.g.*, Exs. 64, 65.)

Beginning in the fall of 2005, the outstanding creditors, Mike Kerr, Jim Holloway and Unisource, began demanding repayment from Mr. Valdez. Unisource informed Mr. Valdez that the outstanding bill had been turned over to its collections department. Mr. Kerr sent a demand letter seeking immediate repayment of $80,000 of the outstanding loan, with the remaining $70,000 due by December 20, 2005. (Ex. 70.) In addition to requesting repayment from Mr. Valdez, Mr. Holloway communicated directly with Ms. Merkel, telling her in November 2005 that his outstanding loan was "[d]ue and payable now." (Ex. 71.)

Prompted by a December 14, 2005 voicemail message from Mr. Kerr threatening legal action for Mr. Valdez's non-payment, (ex. 135), Mr. Valdez sent a letter to Mr. Neuman alleging that Mr. Neuman had breached the Mesa Top Operating Agreement by failing to repay his debts. (Ex. 16.) He threatened to take immediate steps to dissolve Mesa Top unless the outstanding debts were paid within five business days. Mr. Neuman responded, also by letter, that the debts had not been verified as business-related expenses of B2 Brands pursuant to paragraph 8 of the Agreement. (Ex. 17.) Mr. Neuman further informed Mr. Valdez that the $15,000 monthly payments were intended to be used to repay Mr. Valdez's outstanding business debts. On December 23, 2005, Mr. Valdez offered to rescind the Mesa Top Operating Agreement, repay Mr. Neuman $101,614.37 in advanced capital, and release him from all liability. (Ex. 18.) Mr. Neuman rejected Mr. Valdez's offer on January 5, 2006. (Ex. 19.) This action followed.

## III. CONCLUSIONS OF LAW

Mr. Valdez seeks to rescind the Mesa Top Operating Agreement based on four alternate theories: (1) material failure to perform in whole or in part; (2) fraud; (3) abandonment; and (4) mutual or unilateral mistake. With respect to each theory, Mr. Valdez has failed to offer proof sufficient for the Court to conclude that the Agreement was or should be rescinded.

As a preliminary matter, the Mesa Top Operating Agreement states that it "shall be governed by and determined in accordance with the laws of the state of Nevada." (Ex. 4, § 25.) Choice of law provisions in private contracts are generally recognized by federal courts as valid and enforceable. *See MRO Comm., Inc. v. Am. Tel. & Tel. Co.*, 197 F.3d 1276, 1282 (9th Cir. 1999); *see also* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187(2) (1971) (denying the parties' choice of law only if the chosen state has no substantial relationship to the contract, or if application of the state's law is contrary to the public policy of a state with a materially greater interest). The parties are in agreement that Nevada law controls their dispute. Accordingly, the Court will apply the law of the state of Nevada to resolve Mr. Valdez's claims.

Mr. Valdez first seeks rescission based on Mr. Neuman's alleged material failure to perform in whole or in part. In order to justify rescission on this basis, Mr. Valdez was required to prove that Mr. Neuman failed to perform a contractual duty, and that his failure to perform either "defeated the very object of the contract," rendered the object of the contract unattainable, or concerned a matter "of such prime importance" that the contract would not have been made in absence of it. *See Canepa v. Durham*, 153 P.2d 899, 903 (Nev. 1944). Relying on paragraph 15 of the Mesa Top Operating Agreement, Mr. Valdez contends that Mr. Neuman was required to pay him a monthly salary of $15,000. Mr. Valdez did not prove, however, that this obligation

exists under the Agreement. Paragraph 15 only requires Mr. Neuman to fund the operating expenses of Mesa Top in an amount not to exceed $35,000. It says nothing of a salary for Mr. Valdez as part of those expenses. Mr. Valdez next contends that Mr. Neuman was obligated under paragraph 8 of the Mesa Top Operating Agreement to pay all of Mr. Valdez's preexisting $265,000 debt on demand. Again, Mr. Valdez has not offered evidence to prove that such an obligation exists under the Agreement. Paragraph 8 only requires Mesa Top to "assume" debts incurred by Mr. Valdez upon "verification" by Mr. Neuman. It makes no mention of paying all of this debt (whether business related to not), or a time table for doing so. Consequently, Mr. Neuman did not breach the Agreement by failing to pay the debts according to Mr. Valdez's schedule.

Mr. Valdez's second basis for rescission is fraud. To succeed on fraud as a basis for rescission, Mr. Valdez had to prove: (1) a false representation by Mr. Neuman; (2) the false representation was material to the transaction; (3) Mr. Neuman knew or believed that the representation was false; and, (4) Mr. Neuman intended to induce Mr. Valdez to consent to the contract's formation through the fraudulent representation. *See Manhattan Assocs., Inc. v. Pan W. Corp.*, 2:04-CV-01174-BES-RJJ, 2006 U.S. Dist. LEXIS 60834, at *10 (D. Nev. Aug. 23, 2006); *Awada v. Shuffle Master, Inc.*, 173 P.3d 707, 713 (Nev. 2007); *see also Pacific Maxon, Inc. v. Wilson*, 619 P.2d 816, 817-18 (Nev. 1980) (holding that justifiable reliance is not required in an equitable action seeking rescission). Mr. Valdez argues that Mr. Neuman falsely represented that he would pay Mr. Valdez a monthly salary of $15,000. Mr. Valdez failed to prove such a misrepresentation by Mr. Neuman. Mr. Neuman denied making such a representation, and as he testified, such a representation is inconsistent with the parties' deal to be fifty-fifty partners who would share equally in the profits and losses of the business venture.

Mr. Valdez next argues that Mr. Neuman falsely represented that he would pay Mr. Valdez's $265,000 debt, when in fact he did not intend to do so. This claim fails because Mr. Valdez has not proven that Mr. Neuman promised to pay Mr. Valdez's debts on demand. In particular, Mr. Neuman testified that he did not, nor would he ever, make a promise to pay Mr. Valdez's debts without first verifying the nature of those debts. To the contrary, Mr. Neuman testified of his willingness to pay Mr. Valdez's debts when it made good business sense to do so and, more importantly, provided the debts were valid business expenses. Simply put, Mr. Valdez has not proven any fraudulent representation on Mr. Neuman's part, or Mr. Neuman's intent to induce Mr. Valdez to enter the Agreement based on any alleged misrepresentation. *See Manhattan Assocs., Inc.*, 2006 U.S. Dist. LEXIS 60834, at *10.

Mr. Valdez next alleges the Mesa Top Operating Agreement should be rescinded because Mr. Neuman abandoned the Agreement by implication. To prove abandonment, Mr. Valdez had to offer evidence that both parties departed from the terms of the contract by mutual consent. *J.A. Jones Const. Co. v. Lehrer McGovern Bovis, Inc.*, 89 P.3d 1009, 1019 (Nev. 2004). Mr. Neuman's consent could be implied if he acquiesced to actions of Mr. Valdez inconsistent with the terms of the Agreement. *See id.* Mr. Valdez argues that Mr. Neuman impliedly consented to abandoning the agreement after he received Mr. Valdez's December 23, 2005 letter proposing rescission after which Mr. Neuman took no subsequent actions in furtherance of the business. Mr. Valdez failed to prove that Mr. Neuman knowingly and voluntarily abandoned his rights under the Agreement. First, Mr. Neuman's actual conduct does not indicate an intent to abandon the Agreement because he expressly rejected Mr. Valdez's rescission proposal by letter dated January 6, 2006. Second, Mr. Neuman testified that he stopped working on the beverage line on the

advice of counsel and pending resolution of his serious dispute with Mr. Valdez over their business venture. Furthermore, Mr. Valdez failed to present sufficient evidence from which the Court could infer that Mr. Neuman acquiesced to Mr. Valdez's agreement with Mr. Previti to produce the beverages contemplated by the Mesa Top Operating Agreement without Mr. Neuman's or HILO's participation. Indeed, Mr. Neuman testified that he did not even fully understand the extent of that agreement until after Mr. Valdez testified about it at trial.

Finally, Mr. Valdez seeks rescission based on mutual or unilateral mistake. To prove a mutual mistake, Mr. Valdez must offer evidence that "both parties, at the time of contracting, share[d] a misconception about a vital fact upon which they based their bargain." *Gen. Motors v. Jackson*, 900 P.2d 345, 349 (Nev. 1995). That mistake must be "reciprocal and common to both parties, when each alike labored under the same misconception in respect to the terms of the written agreement." *Realty Holdings, Inc. v. Nev. Equities, Inc.*, 633 P.2d 1222, 1223 (Nev. 1981) (per curiam) (*quoting Wilson v. Wilson*, 45 P. 1009, 1010 (Nev. 1896)). Mr. Valdez has not proven a mutual mistake because the evidence adduced at trial showed that Mr. Valdez and Mr. Neuman had different understandings about the terms of the Mesa Top Operating Agreement with respect to paragraphs 8 and 15.[5] Mr. Valdez believed the Agreement entitled him to a $15,000 monthly salary whereas Mr. Neuman believed it did not. Mr. Valdez believed the Agreement obligated Mr. Neuman, via Mesa Top or HILO, to pay his $265,000 debt on demand, whereas Mr. Neuman believed it only obligated him to assume those debts if they were verifiable business expenses. Thus, the parties did not share a common mistake about the terms of the agreement. Without a

---

[5] Mr. Valdez admits as much in his post-trial brief: "The parties have testified to very different understandings of the obligation to pay off the preexisting debts in particular." (Pltf.'s Post Trial Br. at 18.)

common misunderstanding, there can be no mutual mistake. *See Realty Holdings, Inc.*, 633 P.2d at 1223.

To justify rescission based on unilateral mistake, Mr. Valdez had to prove (1) a mistaken belief about a basic assumption of the contract; (2) the mistake had a material effect on the contract; and (3) Mr. Neuman knew or had reason to know of the mistake. *Home Savers, Inc. v. United Sec. Co.*, 741 P.2d 1355, 1356-57 (Nev. 1987) (*citing* RESTATEMENT (SECOND) OF CONTRACTS § 153 (1981)); *see also Gen. Motors*, 900 P.2d at 349 (*citing* CORBIN ON CONTRACTS § 610 (1960)). Mr. Valdez did not prove that Mr. Neuman knew or had reason to know that Mr. Valdez expected the $265,000 debt to be paid immediately upon verification, or the payment of a $15,000 monthly salary. In the absence of Mr. Neuman's knowledge of Mr. Valdez's mistaken belief about the parties' respective rights and obligations under the Agreement, there is no basis for rescission.

## IV. CONCLUSION

For foregoing reasons, Mr. Valdez has failed to offer sufficient proof to establish any of his proposed grounds for rescission. Accordingly, judgment is entered in favor of Defendants Philip Neuman and HILO at Campbell Hall Associates.

DATED: March 17, 2008

CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE